FILED
United States Court of Appeals
Tenth Circuit

February 9, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MATTHEW F. THYBERG,

Defendant - Appellant.

No. 10-2024

(D. New Mexico)

(D.C. No. 2:08-CR-02897-RB-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **TACHA**, and **HOLMES**, Circuit Judges.

---

A jury in the United States District Court for the District of New Mexico

convicted Defendant Matthew F. Thyberg of possessing a firearm after being

convicted of a felony. *See* 18 U.S.C. § 922(g)(1). Before trial he unsuccessfully

moved to suppress statements that he had made to the police without being given

a *Miranda* warning. *See Miranda v. Arizona*, 384 U.S. 436 (1966). He appeals

the district court's denial of the motion. We have jurisdiction under 28 U.S.C.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

§ 1291 and affirm. Defendant was not in custody and therefore was not entitled to a *Miranda* warning.

## I. BACKGROUND

Shortly after 11:00 a.m. on July 18, 2008, Roswell Police Officer Tim Rogers was driving a marked police car when he saw Defendant and another man walking along the street. As Rogers came closer, Defendant ducked into an alley briefly and then hurried to catch up with the other man. Defendant looked at Rogers several times as he drove past. Rogers thought this behavior odd and decided to drive around the block and pass by the two men for a second look. When Rogers next saw Defendant about 30 seconds later, he was leaving the alleyway again after apparently returning to it. Rogers did not see the other man. Defendant was jogging slowly, but speeded up when he saw Rogers. He entered an open field where Rogers saw him drop a black object on the ground and continue to jog another 15 feet before slowing his pace. Rogers drove his car to meet Defendant as he left the field. Defendant reached the street about 10 feet in front of Rogers, who was standing outside his car. Rogers had not activated his siren or emergency lights.

In a conversational tone Rogers asked Defendant to come talk to him; Defendant complied. When Rogers asked for identification, Defendant gave him a New Mexico Department of Corrections identification card. Rogers had never met Defendant before but recognized his name from a prior investigation.

Rogers decided to pat Defendant down. He first asked Defendant whether he had anything on him that could cause an injury during the frisk. Defendant stated that he had a needle and pulled a syringe from his left front pocket. At Rogers's direction, Defendant placed it on the hood of the car, and Rogers then frisked him. Thinking that Defendant, who was acting very nervous, had disposed of drugs or drug paraphernalia in the field, Rogers asked Defendant what he had dropped there. Defendant said he had not dropped anything and told Rogers that he was on his way to meet his probation officer. Rogers turned on his belt recorder and asked Defendant whether he had been using heroin. Defendant admitted that he had. They agreed that if Defendant was tested for drugs when he visited the probation officer, the test would likely be positive. When Rogers again asked Defendant what he had dropped in the field, he responded by saying that he was going to be arrested.

Rogers told Defendant that he would give him a break on the needle. He then asked Defendant to sit in the patrol car, saying "Just don't take off," but twice adding "You're not under arrest or anything like that." R., Vol. 1 at 37. Defendant sat in the backseat of the car; he first had his feet outside the car and then voluntarily placed them inside. The car door was open. Rogers stood outside the car and leaned slightly toward Defendant to hear what he was saying.

They then had the following discussion:

Mr. Thyberg: Stopped by a cop. Going to jail.

Officer Rogers:  You're not going to jail unless you've been dumping stuff over there, but that's where I'm going to go.
Mr. Thyberg:  You'll let me go?
Officer Rogers:  Tell me the truth.
Mr. Thyberg:  Huh?
Officer Rogers:  Tell me the truth.
Mr. Thyberg:  You'll let me go, though, if I tell you the truth?
Officer Rogers:  What did you dump?
Mr. Thyberg:  All I know is it's hot, man.  I'll get in trouble because of that. (Inaudible).
Officer Rogers:  I told you I'll give you a break on the needle.
Mr. Thyberg:  All right.
Officer Rogers:  I told you—
Mr. Thyberg:  (Inaudible).
Officer Rogers:  What did you dump?
Mr. Thyberg:  Man, you need to give me a break.  I'm going to go to jail for it.
Officer Rogers:  Is it drugs?
Mr. Thyberg:  No.
Officer Rogers:  What did you dump?
Mr. Thyberg:  A little gun.
Officer Rogers:  It was a gun?  What are you doing with a gun, man?
Mr. Thyberg:  Somebody tried to jump me the other day, broke my ribs and everything the other day.

*Id.* at 37–38.  Rogers did not read Defendant his *Miranda* rights.

After being told of the gun, Rogers shut Defendant in the car and walked into the field to retrieve it.  Another officer arrived as Rogers was returning to his car, and they arrested Defendant.  Rogers stated that he would call Defendant's parole officer and tell him that Defendant had been very cooperative and honest; Defendant responded, "I told the truth." *Id.* at 39.  Defendant was placed in handcuffs and taken to the Roswell Police Department.

Before Rogers discovered the gun, he had touched Defendant only to conduct a pat-down. Defendant was not shut in the squad car until Rogers went to collect the gun, and he was not placed in handcuffs until Rogers had found the gun. Rogers never threatened Defendant, never yelled, raised his voice, or drew his weapon. About three minutes elapsed between the time that Rogers stopped his car next to the field and the time he closed the car door on Defendant and went to retrieve the gun.

At the police station Rogers took Defendant to a booking room. While there, Defendant made several calls to tell friends that he was in jail and to try to arrange a bond. During these calls Defendant repeatedly said that he had been arrested for having "that gun." *Id.* at 44, 46–47. The statements were not made to Rogers or in response to questions from Rogers.

## II.  DISCUSSION

Defendant acknowledges that his initial stop by Rogers was valid under *Terry v. Ohio*, 392 U.S. 1 (1968), as was the pat-down. His sole complaints are that his statements to Rogers in the police car were obtained in violation of *Miranda* and that his statements at the police station were fruits of the prior unlawful interrogation.

"In reviewing a district court's ruling on a motion to suppress, this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party." *United States v.*

*Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (internal quotation marks omitted). "The ultimate question of whether *Miranda* applies, however, is reviewed de novo." *Id.*

### A. Statements in the Field

Defendant was not informed of his *Miranda* rights before he made his statements to Rogers in the police car. But "[o]n its own terms, *Miranda* applies only to custodial interrogations. Thus, *Miranda* rights need only be given to a suspect at the moment that suspect is in custody and the questioning meets the legal definition of interrogation." *Id.* (brackets, citation, and internal quotation marks omitted). The government conceded at oral argument that Rogers was interrogating Defendant; so the sole issue is whether Defendant was in custody. "An individual is in custody of the authorities under *Miranda* if he is deprived of his freedom of action in any significant way, or his freedom of action is curtailed to a degree associated with formal arrest." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (citation and internal quotation marks omitted). "We therefore must determine whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest." *Id.* (brackets, ellipses, and internal quotation marks omitted). "A reasonable person does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *Jones*, 523 F.3d at 1239 (internal quotation marks omitted).

We have no bright-line rule for determining whether a person is in custody. The inquiry is fact intensive, focusing on a variety of factors. "First, we consider the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* at 1240 (internal quotation marks omitted). "Second, we look at the nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* (internal quotation marks omitted). Third, we determine whether police dominated the encounter by considering the following:

> Separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* (brackets and internal quotation marks omitted).

In weighing these considerations we keep in mind that "[g]enerally, *Miranda* warnings are not implicated in the context of a valid *Terry* stop." *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009) (ellipses and internal quotation marks omitted). As we have explained:

> [T]he typical police-citizen encounter envisioned by the Court in *Terry* usually involves no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated than that surrounding the kinds of interrogation at issue in *Miranda*.

*Id.* at 1275–76 (internal quotation marks omitted).  There is a limited exception to this general rule, however, "if [police] take highly intrusive steps [such as handcuffing and questioning at gunpoint] to protect themselves from danger."  *Id.* at 1276 (ellipses and internal quotation marks omitted); *see also Berkemer v. McCarty*, 468 U.S. 420, 441 (1984) (declining to adopt a categorical rule that traffic stops require or do not require *Miranda* warnings).

Applying the factors in *Jones*, we conclude that Defendant was subjected only to a typical noncustodial *Terry* stop.  The second and third *Jones* factors argue strongly against custody.  Rogers's questioning of Defendant was not prolonged and accusatory.  *See United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) (one-hour interview during which the questioning was not "unusually confrontational" was not custodial interrogation).  Before Defendant admitted that he had dropped a gun in the field, the entire encounter had lasted only three minutes.  Rogers primarily asked what Defendant had dropped; only once did he ask, "Is it drugs?"  R., Vol. 1 at 38.  Rogers questions were not harassing.  His tone was conversational.

Also, the interview was not dominated by police.  Defendant was alone; but he had not been forcibly separated from friends or family.  The conversation took place near midday on a public street with only one officer present.  Rogers never drew his weapon or raised his voice.  Aside from the pat-down at the beginning of

the encounter, Rogers never touched Defendant or used force before Defendant made the statements.

To be sure, the first factor is of some support to Defendant's position. Rogers never specifically told Defendant that he did not have to answer questions or that he could leave. On the contrary, when Rogers asked Defendant to sit in the patrol car, he said, "Just don't take off and go nowhere." *Id.* at 37. And while Defendant was in the car, he asked whether he would be allowed to go if he told Rogers what he had dropped. On the other hand, Rogers told Defendant that he was not under arrest. Thus, the restrictions on Defendant's freedom were no greater than in a classic *Terry* stop. And in light of the second and third *Jones* factors, those restrictions were not enough to constitute custody under *Miranda*.

Defendant points out that after he admitted having a needle, Rogers could have arrested him and that he had told Rogers that he was on probation and had recently used heroin. He argues that in these circumstances a reasonable person would assume that he was under arrest. But there is a decisive difference between being arrested and merely being subject to arrest. "No Supreme Court case supports the contention that admission to a crime transforms an interview by the police into a custodial interrogation." *Chee*, 514 F.3d at 1114 (brackets and internal quotation marks omitted). "An unstated threat of coercion inherent in the officers' power to arrest is, taken alone, not enough" to render a situation

coercive and custodial. *Jones*, 523 F.3d at 1241 (defendant not in custody even though officers told her that they had sufficient evidence to arrest her).

Viewing the evidence in the light most favorable to the government and considering the totality of the circumstances, a reasonable person in Defendant's position would not have understood his status as the functional equivalent of being under formal arrest. Defendant was not in custody when he told Rogers that he had dropped a gun in the field. Hence, no *Miranda* warnings were required.[1]

### B.    Statements at the Police Station

Defendant acknowledges that the statements at the police station were not made in response to custodial interrogation. He argues that those statements were tainted because the statements in the patrol car were obtained illegally. But the patrol-car statements were lawfully obtained, so the statements at the police station were also admissible.

## III.   CONCLUSION

We AFFIRM the judgment of the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge

---

[1] We need not address the government's argument that the public-safety exception to *Miranda* applied.