STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel J. H. BARTELT, Defendant-Appellant.†

Court of Appeals

*No. 2015AP2506–CR. Submitted on briefs January 25, 2017. —Decided March 1, 2017.*

**2017 WI App 23**

(Also reported in 895 N.W.2d 86.)

† Petition for Review filed.

148

151

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Leon W. Todd*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas J. Balistreri*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶ 1. NEUBAUER, C.J.   Daniel J.H. Bartelt was convicted of the first-degree intentional homicide of Jessie Blodgett upon a jury verdict and first-degree recklessly endangering safety of M.R. upon Bartelt's plea of guilty. During the course of the investigations, detectives from the Washington County Sheriff's Office interviewed Bartelt and he implicated himself in the attack of M.R. Following these oral admissions, the detectives asked if Bartelt would make a written statement, at which point he asked if he should or can talk to a lawyer, and, when told that was an option, he indicated that he preferred that. The detectives left the interview room and a few minutes later placed Bartelt under arrest. The following day, detectives from the

152

City of Hartford met with Bartelt to question him about Blodgett's death. After Bartelt was advised of his *Miranda*[1] rights, he waived them and stated that he was at Woodlawn Union Park on the morning of Blodgett's murder. The detectives then went to Woodlawn Union Park and uncovered evidence connecting Bartelt to Blodgett's murder. The circuit court denied Bartelt's motion to suppress the statements he made and the evidence that resulted from those statements, concluding that Bartelt was not in custody at the time he asked about counsel. Because Bartelt asked about counsel before he was in custody, the detectives from the City of Hartford were not prohibited from interviewing Bartelt. Bartelt now challenges the circuit court's determination of his motion to suppress. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Charges*

¶ 2. Under an amended criminal complaint, Bartelt was charged in the attack on M.R. with attempted first-degree intentional homicide, first-degree recklessly endangering safety, attempted false imprisonment and, in the death of Blodgett, with first-degree intentional homicide.

### *The Suppression Hearing*

¶ 3. At a suppression hearing, Detective Joel Clausing of the Washington County Sheriff's Office testified that as of July 16, 2013, he had identified Bartelt as a person of interest. M.R. had said that her

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

attacker had been in a blue Dodge Caravan and another deputy had run the license plate to a blue Dodge Caravan earlier that month, which was registered to Bartelt's parents. Clausing discovered that the Bartelts had a son, and a photo of him from the Wisconsin Department of Transportation was similar to a composite sketch that was drawn at M.R.'s direction. The police had also collected evidence from the crime scene including beer cans, a knife and its sheath, tape, and blood, but none of it had been analyzed at that point.

¶ 4. Clausing spoke with the Bartelts at their home, and they gave him Bartelt's cell phone number. Clausing called Bartelt around 5:00 p.m., told him that the police were investigating an incident, and that they needed to speak with him. Bartelt was not given any other details, and he did not ask for any additional ones. Bartelt was "very compliant" and asked where and when he should meet the police. Clausing told him to come to the Slinger Police Department because Clausing preferred to do all of his interviews at a station house, and it was about the midway point between Clausing and Bartelt. Bartelt agreed. Two friends dropped Bartelt off at the police department, and they waited for him.

¶ 5. The Slinger Police Department is inside a municipal building that it shares with other offices such as parks and planning. There is one main entrance door used to enter the building, and, once inside the building, there is a specific door for the police department, neither of which is secured during regular business hours. After one enters the lobby of the police department, there is another door that leads to the "internal portion of the police department." This door provides a secured entry but one may freely exit.

¶ 6. At 5:12 p.m., Bartelt was escorted into an interview room with Clausing and Detective Aaron Walsh.[2] Clausing described the interview room as about twenty-five feet from the secured entry door. The front doors to the interview room cannot be locked, and Clausing left them ajar. The room itself is about thirteen-and-one-half feet by ten-and-one-half feet and has windows. Inside were one table and three chairs. Bartelt was asked where he wanted to sit, and then Clausing and Walsh sat on either side of Bartelt. Both Clausing and Walsh were wearing casual clothes, with their badges on their belts and their guns holstered at their sides.

¶ 7. At the outset of the interview, Clausing advised Bartelt that he was "not in trouble" and that he was "not under arrest." Bartelt responded, "[T]hat's good." Clausing repeated that Bartelt was not under arrest and also advised him that he could "get up and walk out of here any time [he] want[ed]." The detectives did not search or frisk Bartelt. During the course of the interview, Clausing learned that Bartelt was nineteen years old, that he had completed a semester of college, and claimed to be working as a "gopher" for a manufacturing company. Bartelt appeared intelligent according to Clausing. When asked, Bartelt said he thought the police were meeting with him about Blodgett. Clausing told him that he and Walsh were investigating an incident at a park that occurred the prior Friday.

¶ 8. Initially, Bartelt denied that he was at the park. He was asked about his whereabouts on that Friday, but other than stating that he was "[p]robably" with his girlfriend and that he "assume[d]" they

---

[2] The interview was videotaped, and we have reviewed it.

watched television and ate dinner together, he could not "remember any specifics." The detectives explained to him about evidence and asked if there was any evidence, such as blood or "something [he] left there," that might show he was at this park last Friday. Bartelt said there was nothing there and asked, "What is this about?" Clausing replied, "I already told you what this is about. We are investigating an incident that happened at a park," with Walsh adding, "[l]ast Friday." Clausing asked, "What if I were to tell you that there might be something that links you there."

¶ 9.    Clausing then explained "Locard's exchange principle" to Bartelt, that a person leaves some of himself, such as fingerprints, sweat, DNA, or clothing fibers, behind. The detectives added that they had evidence "from the person that was out there," which needed to be analyzed by the state crime laboratory, as well as an eyewitness, although this eyewitness had not seen a photograph of Bartelt. Thus, Clausing said, "I can prove that you were out there." So, if Bartelt was "out there," he should "just talk to [the detectives] about what happened or what [he] saw or . . . observed or whatever."

¶ 10.    Walsh added that the police knew that the blue Dodge Caravan he drove was there that Friday and that it had been there other days when Bartelt was supposed to be working. Walsh then confronted Bartelt about his claim that he was working, and he admitted he did not have a job. Bartelt also acknowledged that his claim earlier in the interview that he had injured his thumb when he "[g]ot stabbed with a screw at work" was untrue. Bartelt then said he cut his finger on a knife. When asked to explain, he said he was cooking at home and cut his finger on a knife. Clausing did not believe Bartelt's second explanation,

156

saying "Nobody in their right mind would lie about cutting themselves if it happened at home cooking." Clausing said, "No more lies," and asked that Bartelt "[j]ust be honest." Bartelt admitted he had been to the park and that he had seen "the sketch on TV," but "it wasn't me."

¶ 11. Walsh then went into a lengthy monologue about how the victim was scared, that she was "looking over [her] shoulder every single second," and that the police wanted to give her "some closure" so that she would not have to look over her shoulder any longer. The easiest way to give the victim closure, Walsh said, was for the person who did this to take responsibility. Walsh added that what happened could "be explained by the person that did it." For example, things were not going well for Bartelt—he had lost his job and had hid that from his parents—and the police could understand that situation. When things are not going well for a person, Walsh said, he might do something that is out of his character. "[T]hey are in a bad place in their life," but "they are usually good people . . . and they can continue being a good person by taking responsibility for it."

¶ 12. Clausing told Bartelt that he understood that his first instinct was "self-preservation." There were "two different types of people" sitting in Bartelt's chair at this time, Clausing explained. The person who dared the police to prove it—and they would—and the person who admits he made a mistake, explains why, and expresses regret and the intention to "make things right." Clausing said that he believed in "a second chance" for the person who took responsibility and, when asked, Bartelt said he agreed. Clausing was just "trying to impress upon" Bartelt that it was in his "best interest to come out now and get ahead of it." Later on

157

Bartelt would be able to say that he told them the truth, that he regretted what had happened, but that he "wasn't stalking anyone" and this was "just a spur-of-the-moment thing." "[W]ith that in mind," Clausing asked to hear Bartelt's "side of the story."

¶ 13. Bartelt responded that he made a mistake not telling his parents that he was fired from his job and that it was a mistake for him to leave college. Clausing replied, "It's okay . . . we know what happened." When Bartelt asked "[w]hat happened," Clausing repeated that he knew what happened and he just wanted to understand why. Bartelt said he had no intentions and that he was "just numb." Clausing countered, "[Y]ou had to know that this would be coming . . . . [Y]ou cut yourself. There is blood on the sheet that you tried to throw away," and, Walsh added, on "the beer cans" and "on the knife she took away."

¶ 14. A few moments later Bartelt admitted, among other things, that he was at the park where M.R. was attacked, that he had had a knife, and that he "went after that girl" or ran at her and knocked her down with a knife because he "wanted to scare someone," since "life scares" him. After that, Bartelt said, M.R. screamed, he dropped the knife, and they both ran away. At that point, Clausing testified, in his mind, Bartelt was not free to leave and was going to be placed under arrest.

¶ 15. After Bartelt made these admissions, Clausing asked him to give a written statement. Clausing told Bartelt it would be his "chance to apologize," and Bartelt said, "Can I[,] to her?" Bartelt asked what would happen after he gave a written statement, and Clausing answered that he was unsure, but probably he would have more questions for Bartelt. Bartelt replied, "Should I or can I speak to a lawyer or

158

anything." Clausing answered, "Sure, yes. That is your option." Clausing testified that Bartelt answered that "he would prefer having one present." Clausing asked Bartelt if he could see his cell phone for a minute, and then said he was "going to take it." Bartelt gave Clausing permission to see who had just called him, and Bartelt said it was his mother. At that point, 5:45 p.m., Clausing suspended the interview and left the room with Walsh for about seven or eight minutes. When Clausing returned, he told Bartelt he was under arrest, cuffed his hands, and searched him.

¶ 16.  Clausing noted that during the course of the interview neither he nor Walsh ever yelled; instead, it was a "conversational tone." They never lied to Bartelt. Neither detective ever unholstered or said anything about their weapons. When Bartelt admitted to lying about an injury to his hand, Clausing moved away from the table and shifted his chair closer to Bartelt, leaving them about two feet away from each other. At one point during the interview, Bartelt's phone rang and he was permitted to answer it.[3] Bartelt never asked to use the bathroom or to take a break, and he never requested food or drink. The only time when Bartelt's demeanor changed during the interview was when Blodgett was mentioned, at which point he became emotional; otherwise he was "very stoic." Clausing never read any *Miranda* warnings to Bartelt.

¶ 17.  During cross-examination, Clausing agreed with counsel that he acted no differently once Bartelt started making admissions.

---

[3] The video shows that Bartelt's phone was ringing, he asked, "Can I," and Clausing said, "Sure." Bartelt then looked at his phone and placed it back in his pocket.

¶ 18. The day after Bartelt was arrested, July 17, 2013, at about 2:30 p.m., Detective Richard Thickens of the City of Hartford Police Department, the lead investigator into Blodgett's death, met Bartelt, along with another detective, at the Washington County Sheriff's Department. After informing Bartelt about the nature of the interview, Thickens read Bartelt *Miranda* warnings. Bartelt waived his *Miranda* rights and agreed to speak with Thickens without an attorney present. At the time of this interview, Thickens knew that Bartelt had previously asked about an attorney. Bartelt spoke with Thickens for about ninety minutes during which he said that on the morning of Blodgett's murder he was at Woodlawn Union Park. After Bartelt made those statements, Thickens went to Woodlawn Union Park to investigate, and he discovered physical evidence that was connected to the murder of Blodgett and that contained both her and Bartelt's DNA.

*The Circuit Court Denies Bartelt's Motion to Suppress*

¶ 19. The circuit court denied Bartelt's motion to suppress. The court found that Bartelt had voluntarily come to the Slinger Police Department. Two friends had dropped him off and they waited for him, indicating that Bartelt expected to leave at the conclusion of the interview. Bartelt was not searched, and he was not restrained in any way. The doors to the interview room were not locked, and they remained partially open. Although the detectives were armed, they never removed their weapons. Bartelt was told that he was not in trouble, that he was not under arrest, and that he could leave at any time. Once Bartelt asked for an attorney, the detectives stopped questioning him.

¶ 20. Based on those findings, the court concluded that prior to and at the time Bartelt asked for counsel, he was not in custody for purposes of *Miranda*. After Bartelt had asked for counsel, he was arrested. Nevertheless, *Miranda* warnings are not required even "when custody is imminent."

¶ 21. As for the second interview, the fact that Bartelt had asked about counsel while not in custody did not prohibit Thickens from speaking with him without an attorney present. In other words, asking about counsel was of no legal effect. When Thickens interviewed Bartelt, he was clearly in custody, but Bartelt was given *Miranda* warnings, and he waived his rights freely, knowingly, and voluntarily. It was not until ninety minutes later that Bartelt invoked his right to counsel, at which point the questioning ceased.

## *Convictions and Sentence*

¶ 22. Because the count charging Bartelt with first-degree intentional homicide was severed from the counts related to the attack on M.R., the former proceeded to trial first. A jury found Bartelt guilty of first-degree intentional homicide, and the court sentenced him to life imprisonment without the possibility of release to extended supervision. As for the counts relating to the attack on M.R., Bartelt later pleaded guilty to first-degree recklessly endangering safety and the remaining counts were dismissed and read in. The court sentenced Bartelt to five years of initial confinement and five years of extended supervision, to run consecutive to his sentence of life imprisonment.

## ANALYSIS

### Bartelt's Contentions

¶ 23. Bartelt contends that once he admitted to attacking M.R., combined with other circumstances present at the time, a reasonable person in that situation would not have felt free to terminate the interview and leave. In other words, "his confession . . . transformed his custody status." Consequently, Bartelt was in custody, and all further interrogation had to cease. When, the following day, the detectives from the City of Hartford approached Bartelt to question him about the murder of Blodgett without counsel present, Bartelt's right to counsel was violated. Bartelt did not validly waive his asserted right to counsel. Therefore, Bartelt contends, the statements he made during that second interview and the evidence that was derived from those statements should have been suppressed.

### The Law of Custody

¶ 24. The Fifth Amendment to the United States Constitution and article I, section 8(1) of the Wisconsin Constitution protect a criminal defendant's right against self-incrimination.[4] Specifically, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. One of the rights guaranteed under the Fifth Amendment, as interpreted by the United States Supreme Court in

---

[4] Our supreme court's interpretation of article I, section 8(1) of the Wisconsin Constitution has generally been consistent with the United States Supreme Court's interpretation of the Fifth Amendment to the United States Constitution. *State v. Ward*, 2009 WI 60, ¶ 18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236.

*Miranda,* is the right to have counsel present when a suspect is subjected to a custodial interrogation. *Miranda,* 384 U.S. at 444; *State v. Hambly,* 2008 WI 10, ¶ 41, 307 Wis. 2d 98, 745 N.W.2d 48; *State v. Kramer,* 2006 WI App 133, ¶ 9, 294 Wis. 2d 780, 720 N.W.2d 459.[5] "This is because, when a suspect is in police custody, there is a heightened risk of obtaining statements that 'are not the product of the suspect's free choice.' " *State v. Quigley,* 2016 WI App 53, ¶ 31, 370 Wis. 2d 702, 883 N.W.2d 139 (quoting *J.D.B. v. North Carolina,* 564 U.S. 261, 268–69 (2011)).

¶ 25.   Once a suspect who is subject to a custodial interrogation invokes his or her right to counsel, all further interrogation must cease until an attorney is present.[6] *State v. Kramar,* 149 Wis. 2d 767, 785, 440 N.W.2d 317 (1989). "[A] valid waiver of that right to counsel cannot be established by showing only that the accused responded to further police-initiated custodial interrogation even if the accused has been advised of his rights," but, rather, the accused must initiate further communication with the police. *Id.* at 785–86.[7]

---

[5] In order to protect a suspect's Fifth Amendment privilege against self-incrimination, a suspect who is interrogated while "in custody" is entitled to *Miranda* warnings. A suspect must be warned prior to questioning that he or she has the right to remain silent, that anything he or she says can be used against him or her in a court of law, that he or she has a right to an attorney, and that if he or she cannot afford an attorney, one will be provided free of charge. *Miranda,* 384 U.S. at 479.

[6] We assume without deciding that Bartelt made an unequivocal request for counsel. Since we hold that Bartelt was not in custody at the time he asked about counsel, we need not address the State's alternative argument for affirmance, that Bartelt's request for counsel was equivocal.

[7] "If someone is subjected to custodial interrogation [after requesting counsel] and makes statements, whether exculpa-

¶ 26. However, if a defendant is not in custody, "he or she may not invoke the right to counsel under *Miranda*." *Kramer*, 294 Wis. 2d 780, ¶ 9. If a suspect requests counsel but is not in custody, the police may continue to question the suspect. *State v. Lonkoski*, 2013 WI 30, ¶¶ 41–42, 346 Wis. 2d 523, 828 N.W.2d 552.

¶ 27. A suspect is in custody when that suspect is "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In other words, custody is the equivalent of "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (citation omitted); *Lonkoski*, 346 Wis. 2d 523, ¶ 6. This is the ultimate inquiry. *Thompson*, 516 U.S. at 112. If, under the totality of the circumstances, "a reasonable person would not feel free to terminate the interview and leave the scene," then the suspect is in custody. *Lonkoski*, 346 Wis. 2d 523, ¶ 6 (citation omitted). In making that determination, courts will consider "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." *Id.* (citation omitted). On the latter, courts have considered whether the defendant was handcuffed, whether a gun was drawn on the defendant, whether a *Terry*[8] frisk was performed, the manner in which the defendant was restrained, whether the defendant was moved to another

tory or inculpatory, then those statements constitute a *Miranda* violation and, absent exceptions, cannot be used by the prosecution." *See State v. Quigley*, 2016 WI App 53, ¶ 31 n.8, 370 Wis. 2d 702, 883 N.W.2d 139 (citing *Miranda,* 384 U.S. at 444).

[8] *Terry v. Ohio*, 392 U.S. 1 (1968).

location, and the number of police officers involved. *State v. Gruen*, 218 Wis. 2d 581, 594–96, 582 N.W.2d 728 (Ct. App. 1998).

## The Standard of Review

¶ 28.  An alleged *Miranda* violation is a question of constitutional fact, which presents a mixed question of law and fact. *State v. Hassel*, 2005 WI App 80, ¶ 7, 280 Wis. 2d 637, 696 N.W.2d 270. The circuit court's findings of facts will be upheld unless clearly errone-ous, but its determinations of law will be reviewed independently.[9] *Id.*

## Bartelt Was Not in Custody

¶ 29.  Looking at the circumstances of the inter-rogation, Bartelt voluntarily agreed to come to the Slinger Police Department. *See Lonkoski*, 346 Wis. 2d 523, ¶ 31 (holding that place of interview was not custodial because, while it was at the sheriff's depart-ment, the defendant came there voluntarily). He did not know the reason why the police wanted to speak with him, and he did not initially ask. He thought the matter concerned Blodgett. Two friends dropped off Bartelt at the station and waited for him, which, as the circuit court concluded, suggests that he thought that he would be free to leave after the interview. Bartelt was led through a secured entry into the "internal portion of the police department" to the interview room. Although that entry was secured, once inside,

---

[9] Bartelt concedes that "the historical facts are uncon-tested."

one could exit freely. The doors to the interview room were not locked and were left somewhat ajar, which suggested that Bartelt was free to leave at any time. *See id.*, ¶¶ 30–32 (holding that unlocked doors to interview room, which officers repeatedly used throughout interview, and fact that defendant was asked if he preferred the doors open or closed, all indicated a lack of custody).

¶ 30. At the outset of the interview, Clausing told Bartelt that he was "not in trouble" and that he was "not under arrest." Bartelt indicated that he understood by responding "that's good." Clausing also advised Bartelt that he could "get up and walk out of here any time [he] want[ed]." *See Quigley*, 370 Wis. 2d 702, ¶¶ 40–41 (collecting cases for proposition that advising a suspect that he or she is free to leave is one of the "most important factors" to consider, which is strengthened by the suspect's acknowledgment of that advice).

¶ 31. The detectives did not search or frisk Bartelt, and they did not restrain him in any way. *See Lonkoski*, 346 Wis. 2d 523, ¶ 32 (holding that because the suspect was not handcuffed or frisked, and the interrogating officers never drew their weapons, these factors pointed to a lack of custody). The detectives never made any show of authority, such as removing their firearms, other than at one point when Bartelt was caught in a lie and Clausing moved his chair closer to Bartelt and away from the table. When Bartelt's phone rang during the interview, he was permitted to answer it, which suggested a normal state of affairs, the detectives were not controlling his actions, and he was not being kept in isolation. *See United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (stating that a cellular phone provides a line of communication

between the suspect and the outside world and to some extent mitigates the incommunicado nature of interrogations with which *Miranda* was concerned and the psychological pressure associated with being isolated in an interview room). Bartelt never asked to use the bathroom or for food or drink during the "relatively short" thirty-five minute interview. *Lonkoski*, 346 Wis. 2d 523, ¶ 31. These factors nearly all lead to the conclusion that Bartelt was not in custody.

¶ 32.   As the interview progressed, Bartelt was increasingly "treated . . . like the target of a serious felony investigation," which, he argues, is indicative of custody. Initially, the detectives attempted to get Bartelt to admit that he had been at the park at the time of the "incident" without telling him about the nature of the incident or accusing him of being involved. But, each time Bartelt hesitated, the detectives increasingly insinuated, first, that he had been there at the time and, then, that they suspected he had been involved in this incident.

¶ 33.   The detectives told him that they had recovered evidence from the scene, such as beer cans, a sheet, and a knife, all of which contained blood—although this evidence had yet to be tested by the state crime laboratory and, thus, was not yet connected to Bartelt—and that they had an eyewitness, although this eyewitness had not yet seen a photograph of Bartelt and, thus, had not identified him. The detectives said they knew "[w]hat happened" and they just wanted to understand why. The detectives suggested that Bartelt was not a bad person, that sometimes a good person will do bad things because of problems in his life, that it might have been "just a spur-of-the-moment thing," and that it would be better to take responsibility now.

¶ 34.   Yet, contrary to Bartelt's contention, the fact the detectives essentially communicated to him that he was the focus of their investigation did not transform the interview into a custodial interrogation. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) (stating that even when an officer clearly tells a person under interrogation that he is a prime suspect such is not, in itself, dispositive of the custody issue, because some suspects are free to come and go until the police decide to make an arrest; rather, the weight and pertinence of any such communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (stating that *Miranda* warnings are not required "because the questioned person is one whom the police suspect," and any police interview of a criminal suspect will have coercive aspects to it).

¶ 35.   Certainly the detectives applied some psychological pressures on Bartelt to persuade him to confess, but, unlike custodial interrogations, the other circumstances present here—coming voluntarily to the police department, being told he could leave anytime he wanted, keeping his cell phone and being permitted to answer it, and the door to the interview room being kept open, among other circumstances—did not suggest that Bartelt could not have terminated the interview and left. *See LeBrun*, 363 F.3d at 718, 720–21 (where the police used psychological ploys to facilitate a confession, told the defendant he was a prime suspect and there was significant evidence establishing that he was the killer, and that a trial would ruin him and his family, these "purportedly coercive aspects" were largely irrelevant to the custody determination, and "[w]hatever coercion existed . . . was not of the sort

that a reasonable person would perceive as restricting his freedom to depart"; rather, the fact that the defendant was never physically restrained, never placed in handcuffs, told he was free to leave, and called his wife during the interview using his own cell phone all suggested that he was free to leave).

¶ 36.    Further, the circumstance of Bartelt ultimately making incriminating admissions, when considered among all the other circumstances, did not render him in custody.

¶ 37.    In *Mathiason*, 429 U.S. at 493, the police were investigating a burglary of a residential home, and the owner told police that the defendant, a "close associate" of her son and a parolee, was the only person she thought could have burglarized her home. About twenty-five days after the burglary, an investigating officer left his card at the defendant's residence, writing on it, "I'd like to discuss something with you." *Id.* The next day the defendant called the officer and, after the defendant indicated that he had no preference as to where to meet, agreed to meet the officer at the state patrol office in an hour and a half. *Id.* The state patrol office housed several state agencies and was about two blocks from the defendant's home. *Id.*

¶ 38.    Once the officer and the defendant met, the officer escorted him into an office. *Id.* The two men sat at a desk and the door to the office was closed. *Id.* The officer advised the defendant that he was not under arrest. *Id.* The officer then told the defendant that he believed the defendant was involved in a burglary and falsely told him that his fingerprints were found at the scene. *Id.* Within five minutes, the defendant admitted that he had taken the property. *Id.* At the end of the

interview, the officer released the defendant and told him he would refer the matter to the district attorney. *Id.* at 494.

¶ 39. The United States Supreme Court held that the defendant was not in custody at the time he gave those incriminating statements. *Id.* at 495. The Court pointed out that the defendant came voluntarily to the police station, he was informed he was not under arrest, and, after the thirty-minute interview, he was allowed to leave. *Id.* The court reasoned:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason*, 429 U.S. at 495. Further, the Court did not think it even relevant for purposes of custody that the officer falsely told the defendant that his fingerprints were at the scene. *Id.* Thus, *Mathiason* teaches that confronting a suspect with incriminating evidence does not automatically convert the interview into a custo-

170

dial interrogation. *See United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) (holding that defendant was not in custody even though agents told her that they had sufficient evidence to arrest her).

¶ 40.    Just as the police telling a suspect that they have sufficient evidence to arrest that suspect, and even identifying potentially incriminating evidence that they possess to the suspect, does not necessarily convert a noncustodial setting to a custodial one, a defendant making an incriminating statement does not necessarily transform a noncustodial setting to a custodial one. Indeed, "no Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation." *Locke v. Cattell*, 476 F.3d 46, 53 (1st Cir. 2007).

¶ 41.    In *United States v. Chee*, 514 F.3d 1106, 1110 (10th Cir. 2008), the defendant sexually assaulted a twenty-eight-year-old woman "with both mental and physical disabilities." The woman, who knew the defendant, told her grandparents who reported the incident to the police. *Id.* A federal agent left his business card at the defendant's home with his daughter, telling her that he wanted to speak with him about a firearm the defendant had found in a car he had purchased at a government auction months earlier. *Id.* The defendant eventually called the agent, and they agreed to meet at a police department. *Id.*

¶ 42.    The next morning, the defendant arrived at the police station with his wife. *Id.* The agent and another investigator escorted the defendant without his wife into the police chief's office. *Id.* at 1111. The agent told the defendant that he was not under arrest or in any trouble, that he could leave if he wanted and did not have to talk with them. *Id.* After talking with

171

the defendant about the firearm, the agent asked him about the sexual assault. *Id.* The agent told the defendant that the woman's grandmother was very upset, and the defendant replied that he knew she was upset and had tried to apologize. *Id.* The agent asked the defendant what happened, and the defendant denied having sex with the woman. *Id.*

¶ 43. The agent then falsely told the defendant that the FBI had DNA evidence from the scene, and the defendant admitted that he had had sex with the woman against her will. *Id.* At the agent's suggestion, the defendant agreed to write a letter of apology to the woman and her grandmother. *Id.* After the defendant finished the letter and the agent asked a few more questions, the defendant asked what would happen next, and the agent replied that someone else would decide. *Id.* The interview lasted less than one hour, and the agent then let the defendant leave. *Id.*

¶ 44. The defendant argued that he was in custody under *Miranda* once the topic moved from the firearm to the sexual assault and that, at a minimum, he should have received *Miranda* warnings once he orally confessed. *Id.* at 1113. The Tenth Circuit Court of Appeals rejected the defendant's contentions. *Id.* It cited with approval the First Circuit's statement, "[N]o Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation." *Id.* at 1114 (alteration in original; citation omitted). The Tenth Circuit also pointed out that "the environment did not change once the topic shifted to the sexual assault." *Id.* Viewing all of the circumstances, such as the brevity of the interview, the fact that the defendant was told that he was free to leave and did, in fact, leave at the end of the interview, a reasonable person in his situation

would not have believed he was effectively under arrest, held the court. *Id.*; *see also Locke*, 476 F.3d at 49–55 (holding that it was not an unreasonable application of the law for the state court to conclude that the defendant was not in custody even after initially implicating himself in robbery and where, among other circumstances, defendant was interviewed at police headquarters, defendant was confronted with his codefendant's statements implicating him in robbery and murder, codefendant and defendant had two conversations that the police monitored, and at the end of the interview the defendant was arrested); *Thomas v. State*, 55 A.3d 680, 692 (Md. 2012) (pointing out that the fact a suspect was arrested at the end of police interview does not necessarily mean the suspect was in custody before the arrest).

¶ 45. If it were as Bartelt argues, then at the moment of the first incriminating statement, the police would have to stop questioning the subject and administer *Miranda* warnings, which is without basis in *Miranda* jurisprudence. *See Miranda*, 384 U.S. at 478 ("There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime."); *Commonwealth v. Hilton*, 823 N.E.2d 383, 396 (Mass. 2005) ("[A]n interview does not automatically become custodial at the instant a defendant starts to confess.").

¶ 46. Instead, "[a] confession is just one of the circumstances to consider in evaluating whether a reasonable person would believe he or she was free to leave." *State v. Oney*, 989 A.2d 995, 1000 (Vt. 2009). What matters in that evaluation is the police's response to a suspect's incriminating statement, for *Miranda* is concerned "with a type of interrogation

173

environment *created* by the police" and it is this "atmosphere *created* by the authorities for questioning" that necessitates *Miranda* warnings. *State v. Clappes*, 117 Wis. 2d 277, 283, 344 N.W.2d 141 (1984) (emphasis added).[10]

¶ 47. The *Miranda* Court itself said that *Miranda* warnings are required "when an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning." *Miranda*, 384 U.S. at 478 (emphasis added). After making an incriminating statement, a suspect might believe an arrest is immi-

---

[10] We recognize that that there are cases from other jurisdictions that have held that a suspect's incriminating admission is dispositive on the custody issue. *See Jackson v. State*, 528 S.E.2d 232, 235 (Ga. 2000); *State v. Ripic*, 587 N.Y.S.2d 776, 782 (N.Y. App. Div. 1992). In reply, Bartelt argues that "none" of the cases he cited in his main brief stands for the proposition that a confession is a dispositive factor. Our reading of *Jackson* and *Ripic* is to the contrary and, thus, we conclude that they are not persuasive. *See State v. Thomas*, 33 A.3d 494, 512 (Md. Ct. Spec. App. 2011) (citing *Jackson* and *Ripic* in the context that "when a suspect incriminates himself" or herself, "[s]ome courts . . . appear to view this factor as dispositive"), *aff'd*, 55 A.3d 680 (Md. 2012). In any case, Bartelt argues, other cases he has cited simply view a suspect's incriminating statement "to a serious crime [as] a significant factor in this analysis." *See Ackerman v. State*, 774 N.E.2d 970, 978–79 (Ind. Ct. App. 2002) ("[W]e certainly do not consider [defendant's admissions] to be dispositive as to custody . . . [h]owever we do consider the admissions relevant to the question of custody."). As we emphasize and other cases have explained, a defendant's incriminating statement is a relevant circumstance but, again, it is the impact of that statement on the conditions in the interrogation room created by the police that bear on custody, that is, "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citation omitted).

nent, but that is not the test. "[T]here is a decisive difference between being arrested and merely being subject to arrest." *United States v. Thyberg*, 411 F. App'x 181, 185 (10th Cir. 2011); *see United States v. Caiello*, 420 F.2d 471, 473 (2d Cir. 1969) ("It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning."); *see also Lonkoski*, 346 Wis. 2d 523, ¶ 38 (holding that *Miranda* does not apply to "imminent custody").[11]

¶ 48.   As we have noted, the "ultimate inquiry is . . . whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citation omitted). Here, the police did not change the circumstances of the interview after Bartelt made incriminating admissions.[12] The tone of the discussion throughout was not aggressive or confrontational. The officers were low-key and respectful. There was no difference in how Bartelt was treated.

---

[11] While *United States v. Thyberg*, 411 F. App'x 181 (10th Cir. 2011), is an unpublished opinion of the Tenth Circuit Court of Appeals, FED. R. APP. P. 32.1, which the Tenth Circuit has adopted, permits the citation of an unpublished federal judicial opinion issued on or after January 1, 2007. *See State v. Duchow*, 2008 WI 57, ¶ 25 n.20, 310 Wis. 2d 1, 749 N.W.2d 913.

[12] Bartelt points out that Clausing testified that after Bartelt made incriminating statements, he was not free to leave. It is well established that "the subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. *Stansbury v. California*, 511 U.S. 318, 323 (1994). There was no objective manifestation of Clausing's thoughts—he never communicated this to Bartelt.

There was no increased compulsion inherent in the surroundings. *See Chee*, 514 F.3d at 1114 (noting that "environment did not change once the topic shifted to the sexual assault" and tone of the interview did not change even after defendant confessed); *Thomas*, 55 A.3d at 696 (holding that a confession does not per se render a suspect in custody, and once defendant confessed, the atmosphere of the room never changed; thus, admission did not render defendant in custody); *State v. Lapointe*, 678 A.2d 942, 958 (Conn. 1996) ("While . . . admissions of culpability may lead the police either to arrest a suspect or to place restraints on his freedom approximating an arrest, the police in this case never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial.").

¶ 49.   In support of his argument that no reasonable person would have believed that he was free to leave after confessing to an attempted homicide or other serious crime in the presence of police, Bartelt cites to *State v. Koput*, 142 Wis. 2d 370, 418 N.W.2d 804 (1988). He hinges his argument on a statement from that case that "the defendant was not in custody until after his confession, sometime after 4:15 P.M." *Id.* at 380. But, *Koput* does not control the question here, because the claim there was that the defendant was in custody when he confessed at 4:15 P.M.—a claim the supreme court rejected—and not, as here, whether a defendant was in custody after making incriminating statements. Whatever amounted to custody "sometime after 4:15 P.M." in *Koput*, whether it was being told he was under arrest, or being placed in handcuffs, or some other combination of circumstances, is not evident from the supreme court's decision. In fact, even after the defendant confessed in *Koput*, the officers ques-

176

tioned whether he really was the killer or just "a crackpot." *Id.* at 382. Thus, again, *Koput* does not stand for the proposition that Bartelt claims.

¶ 50.  Bartelt also places significance on the fact that Clausing took his cell phone after he made incriminating statements. But, in doing so, he neglects the sequence of events. After Bartelt made incriminating statements, Clausing did not immediately take custody of Bartelt's cell phone. Rather, Clausing asked Bartelt to give a written statement, then Bartelt asked about counsel (before he was arrested or placed in the functional equivalent of custody), Bartelt and Clausing then briefly discussed the option of having counsel present, and then Clausing took Bartelt's cell phone. Up until that point of Clausing taking Bartelt's cell phone, the dynamics in that room bearing on the question of custody had not changed. So, at the moment Bartelt asked about counsel, he was not in custody and any request for counsel was of no significance for purposes of *Miranda*.

¶ 51.  In this relatively brief interview of just over thirty-five minutes, Bartelt was not physically restrained in any way, was not frisked, was told he was free to leave and not under arrest, had access to an unlocked and slightly open door, and was permitted to keep and check his cell phone. We conclude, therefore, that under the totality of the circumstances, Bartelt was not in custody at the time he asked about counsel. The circumstances surrounding the station house interrogation do not show that at the time Bartelt confessed he had "no choice but to submit to the [detectives'] will and to confess," *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984), but, rather, he made a "free

and informed choice" to implicate himself in the attack on M.R., *Roberts v. United States,* 445 U.S. 552, 561 (1980).

¶ 52.  Since Bartelt was not in custody when he asked about counsel, his Fifth Amendment right to counsel did not attach. *See State v. McNeil,* 155 Wis. 2d 24, 36, 454 N.W.2d 742 (1990), *aff'd,* 501 U.S. 171, 182 n.3 (1991) (noting that *Miranda* rights cannot be invoked anticipatorily, that is, in a context other than custodial interrogation); *Lonkoski,* 346 Wis. 2d 523, ¶ 36 (rejecting argument that *Miranda* should apply because even if he was not in custody when he asked for an attorney, he undisputedly was in custody a few seconds later). Since Bartelt's right to counsel did not attach, detectives from the City of Hartford Police Department were not prohibited from interrogating Bartelt the next day in the absence of counsel. *See Lonkoski,* 346 Wis. 2d 523, ¶ 41; *see also Kramer,* 294 Wis. 2d 780, ¶ 14; *cf. Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981).

## CONCLUSION

¶ 53.  The circuit court properly denied Bartelt's motion to suppress because he was not in custody at the time he asked about counsel. Since Bartelt was not in custody at that time, detectives from the City of Hartford Police Department were not prohibited from interrogating Bartelt the next day in the absence of counsel. Accordingly, the judgments of conviction are affirmed.

*By the Court.*—Judgments affirmed.