# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2506-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>       Plaintiff-Respondent,<br>   v.<br>Daniel J. H. Bartelt,<br>       Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 148, 895 N.W.2d 86
PDC No: 2017 WI App 23 - Published

| | |
|---|---|
| OPINION FILED: | February 20, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 14, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Washington |
| JUDGE: | Todd K. Martens |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | A.W. BRADLEY, J. dissents, joined by ABRAHAMSON, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs and an oral argument by *Leon W. Todd*, assistant state public defender.

For the plaintiff-respondent, there was a brief by *Amy C. Miller*, assistant solicitor general, *Brad D. Schimel*, attorney general, *Misha Tseytlin*, solicitor general, and *Ryan J. Walsh*, chief deputy solicitor general. There was an oral argument by *Amy C. Miller.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP2506-CR
(L.C. No. 2013CF276)

STATE OF WISCONSIN                  :          IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Daniel J.H. Bartelt,**

    **Defendant-Appellant-Petitioner**

**FILED**

**Feb 20, 2018**

Sheila Reiff
Clerk of Supreme Court

REVIEW of a published decision of the court of appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J.   This review concerns the point in time at which a person is "in custody" for purposes of Miranda.[1]   Daniel J.H. Bartelt asks us to overturn a decision of the court of appeals, affirming the circuit court's[2] judgment entered in favor of the State regarding Bartelt's motion to suppress incriminating statements, and concluding that Bartelt was not in custody at the time the statements were made.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966); cf. Edwards v. Arizona, 451 U.S. 477 (1981).

[2] The Honorable Todd K. Martens of Washington County, presided.

¶2 Bartelt presents two issues: first, whether Bartelt's confession to a serious crime transformed his custody status from noncustodial to "in custody;" and second, whether Bartelt's request for counsel was unequivocal such that police officers violated his Fifth Amendment rights when they questioned him the following day without counsel present.

¶3 On the first issue we conclude that, under the totality of the circumstances attendant to his interview, Bartelt's confession did not transform his custody status. Rather, Bartelt was not in custody until Detectives Joel Clausing and Aaron Walsh of the Washington County Sheriff's Department took his cell phone, approximately ten minutes after his confession, and instructed him to remain in the interview room. Because we determine that Bartelt was not in custody until this point, which was after his alleged request for counsel, we need not and do not reach the issue of whether his alleged request for counsel was unequivocal.

¶4 Accordingly, we affirm the court of appeals.

## I. BACKGROUND

¶5 This case arises from two crimes committed in July 2013. On July 12, 2013, M.R. was assaulted by a male suspect with a knife while walking her dog in Richfield Historical Park in the Village of Richfield. M.R. was tackled to the ground and suffered several knife wounds before disarming the suspect, who fled the scene in a blue Dodge Caravan. Three days later, on July 15, 2013, Jessie Blodgett, a friend and former girlfriend

2

of Bartelt, was found dead in her home in the City of Hartford. According to preliminary autopsy findings, the cause of death was ligature strangulation.

¶6   As of July 16, 2013, Clausing and Detective Richard Thickens of the Hartford Police Department had identified Bartelt as a person of interest in the attack on M.R.  Earlier that month, a deputy had noticed a blue Dodge Caravan at the same park and had run the license plate, which revealed that the vehicle was registered to Bartelt's parents.  Police learned that the Bartelts had a son, and were then able to match Bartelt's photograph from the Wisconsin Department of Transportation with the composite sketch drawn at M.R.'s direction.  Clausing contacted Bartelt around 5:00 p.m. on July 16, and told him that the police were investigating an incident, and that they needed to speak with him.  Bartelt was "very compliant," and agreed to meet with detectives at the Slinger Police Department.

¶7   The Slinger Police Department is located inside a municipal building that it shares with various other offices and departments.  There is one main entrance to the building.  Once inside, a separate entrance leads to the police department. Neither the main door to the building nor the door to the police department is secured during normal business hours, and there are no metal detectors or other security screening devices. Inside the police department, another door leads to the "internal portion" of the department.  This door is locked from

3

the outside, but one can freely exit. The interview room is located about twenty-five feet inside this secured area. The room is thirteen and one-half feet by ten and one-half feet, and contains a table, three chairs and a window. The room can be accessed by either of two doors, neither of which can be locked.

¶8 Bartelt was dropped off by two friends at the Slinger Police Department around 5:12 p.m. His friends waited outside. Clausing testified that Bartelt was escorted to the interview room but was not searched. Bartelt chose the seat on the far side of the table, while Clausing sat at the end, and Walsh sat opposite Bartelt. Clausing and Walsh were wearing civilian clothes; however, they both had their badges displayed on their belts, as well as their service weapons. Clausing testified that one of the doors to the room was left open. Unbeknownst to Bartelt, the interview was recorded by both audio and visual means.

¶9 Clausing began the interview by telling Bartelt that he was not in trouble, he was not under arrest, and he could leave at any time. Clausing did not read Bartelt his Miranda rights. Bartelt, who had just come from the Blodgett residence to pay his respects to the family, believed the police were meeting with him about Blodgett's murder. However, Clausing explained that law enforcement was investigating an attack that had occurred at Richfield Historic Park on the previous Friday. Bartelt was asked a number of preliminary questions and initially denied any involvement. Bartelt stated that he had

4

been with his girlfriend on the day in question, although he could not "remember any specifics." Clausing then explained that cell phones "are kind of like GPS's," and told Bartelt, "I don't want any lies."

¶10 Clausing then observed some scrapes and a cut on Bartelt's hand and arm. Bartelt stated he did not remember how he scraped his arm, but that he had stabbed his hand "with a screw at work." The following exchange then occurred:

> DET. CLAUSING: . . . So what do you think evidence is?
>
> MR. BARTELT: Incriminating items, documents.
>
> DET. CLAUSING: First -- but I'm more of a nuts-and-bolts type of guy. Like, what would you consider to be evidence?
>
> MR. BARTELT: Well --
>
> DET. CLAUSING: Fingerprints?
>
> MR. BARTELT: Yeah.
>
> DET. CLAUSING: Okay. Fibers? Hairs?
>
> MR. BARTELT: Yeah.
>
> DET. CLAUSING: Any DNA? You know, footwear impressions?
>
> MR. BARTELT: Yeah.
>
> DET. CLAUSING: Witness statements, right? Video surveillance, stuff like that, right?
>
> MR. BARTELT: Yeah.
>
> DET. CLAUSING: Is there any evidence that we just talked about which would show that you would be in this park at the time of this incident that had occurred? Is there any evidence out there that would show that?

5

MR. BARTELT: I don't think so . . . What is this about?

¶11 After reminding Bartelt that police were investigating an incident at Richfield Historical Park, Clausing said, "What if I were to tell you that there might be something that links you there." Clausing then proceeded to explain "Locard's exchange principle," which holds that the perpetrator of a crime will bring something into the crime scene——such as fingerprints, sweat, DNA, or clothing fibers——and leave it behind. The detectives added that they had found evidence "from the person that was out there," which needed to be analyzed by the state crime laboratory.

¶12 Clausing next told Bartelt that they had an eyewitness, stating, "I would hate to put down your picture in front of the eyewitness and have them say, that's the guy that was out there." Further, Clausing stated, "I can prove that you were out there. It's not just a tip. I can prove it. And all I'm getting at is that if you were out there, just talk to us about what happened or what you saw or what you observed or whatever." Walsh told Bartelt they knew that his vehicle had been spotted at the park on several occasions when Bartelt was supposed to be at work. Bartelt admitted that he had been laid off for several months, and that the injury was actually the result of a cooking accident.

¶13 At this time Clausing moved his chair closer to Bartelt. When Clausing's face was about two feet from Bartelt's, Clausing told him, "No more lies. It just makes

things worse.  It is spiraling out of control right now . . . . Nobody in their right mind would lie about cutting themselves if it happened at home cooking . . . .  What happened?  Just be honest."  Bartelt admitted that he had been to the park before and that he had seen the sketch on television, but that "it wasn't me."

¶14  Walsh then urged Bartelt to help bring closure to M.R. "Daniel, the truth is going to help us bring some resolution to this for everybody involved . . . .  We have one scared person out there right now . . . and the easiest way to put some resolution to this is [for] the [ ] person that did this to take responsibility."  Walsh added that he could understand why someone would do this, "especially if the person that did it explains to us what they were thinking, where they were in their life."  For example, Bartelt had lost his job and hid that from his parents, and he had dropped out of college after only one semester.  Walsh stated that "when things are not going well for people, they do things that are very out of character."  He added, "I think you are a good person . . . [g]ood people can explain things away and we can understand why they do things. So tell us about the park."

¶15  Following a lengthy narrative from Clausing about the two types of people in this situation——those who take responsibility and those who say "prove it"——Bartelt admitted to being at the park and going "after that girl" because he "wanted to scare someone."  Bartelt told the officers that he had been

7

reading when he saw M.R., and in the "spur of the moment," he decided to "run at her and knock her down and scare her." Bartelt admitted there was no real explanation or motive for the attack; he was "just numb" and scared because "life scares me." Bartelt targeted M.R. because "[t]here was no one else there." Following this admission, Clausing asked Bartelt if he would be willing to provide a written statement of confession. Walsh explained that the written statement would be Bartelt's chance to apologize. When Bartelt asked what would happen after he gave his statement, Clausing responded, "I can't say what happens then. We'll probably have more questions for you, quite honestly." Clausing later testified that, once Bartelt had confessed, he "was going to be under arrest, and he probably wasn't free to get up and leave."

¶16 It was at this point that Bartelt asked, "Should I or can I speak to a lawyer or anything?" Clausing told him, "Sure, yes. That is your option." Bartelt responded, "I think I'd prefer that." At 5:45 p.m., roughly 33 minutes after Bartelt arrived at the station for questioning, Clausing and Walsh suspended the interview, took Bartelt's cell phone, and left the room. When the detectives returned seven or eight minutes later, Clausing told Bartelt he was under arrest, handcuffed him, and searched him. Bartelt was then transported to the Washington County Jail.

¶17 Clausing testified that, during the course of the interview, both he and Walsh spoke in a conversational tone,

8

which did not change even after Bartelt's admission. Neither detective ever made reference to or unholstered their weapons. Bartelt never asked to use the restroom or take a break. At one point during the interview Clausing gave Bartelt permission to answer his cell phone, which Bartelt declined to do.

¶18 The following day, on July 17, 2013, Bartelt was brought to the interview room at the Washington County Sheriff's Department to be questioned by Thickens and Detective James Wolf regarding his relationship with Blodgett. Before commencing with questioning, Thickens read Bartelt his Miranda rights, which Bartelt knowingly and voluntarily waived.

¶19 Bartelt was questioned for approximately 90 minutes about his relationship with Blodgett and his whereabouts on the day of Blodgett's death. Bartelt denied being at the Blodgett residence on July 15, 2013, or having any knowledge of Blodgett's death. Bartelt stated that on the morning of July 15 he had left his house at 6:30 a.m. and drove "all over" before spending a few hours at Woodlawn Union Park. Bartelt then asked for an attorney, at which point the questioning stopped.

¶20 Thickens later drove to Woodlawn Union Park to investigate, and in doing so he collected garbage from the park's receptacles. In one container he found a Frosted Mini-Wheats cereal box containing paper toweling, numerous types of rope and tape, and antiseptic wipes with red stains. One of the ropes later revealed DNA that belonged to both Bartelt and Blodgett, and which matched the ligature marks on Blodgett's

neck. Another rope matched the ligature marks on her wrists and ankles. Based on this evidence and the confession Bartelt made during his first interview, Bartelt was charged with attempted first-degree intentional homicide, first-degree reckless endangerment, and attempted false imprisonment for the attack on M.R., as well as first-degree intentional homicide for the murder of Blodgett.

¶21 Bartelt moved to suppress his statements, and any evidence derived from them, on the grounds that the officers had violated his Miranda rights when they questioned him. The circuit court denied Bartelt's motion, concluding that at the time of his July 16, 2013, interview, Bartelt had voluntarily agreed to speak with police. The circuit court concluded that Bartelt was not in custody until after he had requested an attorney, roughly ten minutes after his confession. Therefore, no Miranda warnings were necessary with respect to the July 16 interview, and police were free to initiate questioning on July 17 because "an assertion of Miranda . . . which a person makes while they are not in custody, does not prospectively prohibit law enforcement from attempting to interview an individual later." Further, with respect to the July 17 interview, the circuit court found that Bartelt was properly given his Miranda warning, which he voluntarily waived.

¶22 Following the denial of Bartelt's suppression motion, the circuit court ordered that the Blodgett homicide charge be separated from the charges related to M.R. After a seven-day

10

jury trial, Bartelt was found guilty of Blodgett's murder. Consequently, he was sentenced to life imprisonment without the possibility of release to extended supervision. Shortly thereafter, the parties reached a plea agreement regarding the attempted murder, reckless endangerment, and false imprisonment charges. In exchange for Bartelt's guilty plea to first-degree reckless endangerment, the State agreed to dismiss and read-in the remaining counts, and Bartelt was sentenced to five years' imprisonment and five years' extended supervision consecutive to his life sentence.

¶23 Bartelt appealed his murder conviction on the grounds that the circuit court improperly denied his suppression motion. Specifically, Bartelt argued that once he confessed to attacking M.R., a reasonable person in his circumstances would have believed he was not free to leave the station, thereby transforming the non-custodial interview into a custodial interrogation. Bartelt therefore argued that all statements made after his admissions about M.R. were inadmissible under the principles of Miranda and Edwards. As a consequence, Bartelt alleges that detectives violated his Fifth Amendment rights when they approached him to question him about Blodgett's murder without counsel being present. Under the exclusionary rule,[3]

---

[3] The exclusionary rule was first adopted by the United States Supreme Court in Weeks v. United States, 232 U.S. 383 (1914), which held that evidence obtained in violation of the Fourth Amendment is inadmissible. This holding was expanded to include state court proceedings in Mapp v. Ohio, 367 U.S. 643 (1961). However, Wisconsin courts have aligned themselves with

(continued)

Bartelt alleged that all derivative evidence discovered as a result of his statements should have been suppressed.[4]

¶24 The court of appeals rejected Bartelt's arguments and affirmed the circuit court's judgment. Bartelt sought review, which we granted. For the reasons explained below, we affirm the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶25 A determination of when custody begins presents a question of constitutional fact that we review under a two-part standard. State v. Jennings, 2002 WI 44, ¶20, 252 Wis. 2d 228, 647 N.W.2d 142. The circuit court's findings of historical fact will be upheld unless they are clearly erroneous. State v. Henderson, 2001 WI 97, ¶16, 245 Wis. 2d 345, 629 N.W.2d 613. Whether those findings support a determination of custody for purposes of Miranda is a question of law that we independently review. Id.

### B. Miranda and Custody

¶26 The Fifth Amendment of the United States Constitution states that "[no person] shall be compelled in any criminal case to be a witness against himself, nor be deprived of life,

---

the federal rule since long before the Mapp holding. See Hoyer v. State, 180 Wis. 407, 417, 193 N.W. 89 (1923).

[4] See State v. Knapp, 2005 WI 127, ¶2, 285 Wis. 2d 86, 700 N.W.2d 899 ("Where physical evidence is obtained as the direct result of an intentional Miranda violation, we conclude that our constitution requires that the evidence must be suppressed.").

12

liberty, or property, without due process of law . . . ." We have interpreted Article I, Section 8(1)[5] of the Wisconsin Constitution consistent with the United States Supreme Court's interpretation of the Fifth Amendment. State v. Ward, 2009 WI 60, ¶18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236.

¶27 In 1966, the Supreme Court held that the Fifth Amendment requires law enforcement to inform suspects of their rights to remain silent and to have an attorney present during custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 458 (1966).[6] These warnings are required because "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of [the suspect]." Id. at 469; see also State v. Quigley, 2016 WI App 53, ¶31, 370 Wis. 2d 702, 883 N.W.2d 139 ("[W]hen a suspect is in police custody, there is a heightened risk of obtaining statements that 'are not the product of the suspect's free choice.'" (internal citation omitted)).

---

[5] Article I, Section 8(1) reads: "[n]o person may be held to answer for a criminal offense without due process of law . . . ."

[6] "[The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. If the accused indicates that he or she wishes to remain silent, questioning must stop. If he or she requests counsel, questioning must stop until an attorney is present. Id. at 474.

¶28 In Edwards, the Supreme Court added a second layer of protection to the Miranda right to counsel by fashioning a bright-line rule requiring law enforcement to immediately cease questioning once a suspect has asserted his or her right to counsel during a custodial interrogation. Further,

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.

Edwards v. Arizona, 451 U.S. 477, 484 (1981). Stated otherwise, once a suspect has invoked his Fifth Amendment right to counsel, the Miranda-Edwards rule prohibits police from engaging in subsequent, uncounseled interrogations regarding the same or separate investigations. Arizona v. Roberson, 486 U.S. 675, 677-78 (1988).[7]

¶29 Over the years, particular emphasis has been placed on when a suspect may effectively invoke his or her Fifth Amendment rights. Miranda stated that "[a]n individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver." Miranda, 384 U.S. at 470. The Supreme Court later clarified this statement, noting that the Court has "never held that a person can invoke

---

[7] However, if it is the accused who initiates further communication with the police, courts typically will conclude that a valid waiver has been made. State v. Kramar, 149 Wis. 2d 767, 785-86, 440 N.W.2d 317 (1989).

14

his _Miranda_ rights anticipatorily, in a context other than 'custodial interrogation' . . . ." _McNeil v. Wisconsin_, 501 U.S. 171, 182 n.3 (1991). The Court continued:

> If the _Miranda_ right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the _Miranda_ right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

_Id._

¶30 These Supreme Court decisions explain that the right to counsel may not be invoked until a suspect is "in custody." Wisconsin courts interpret Article I, Section 8 of the Wisconsin Constitution consistent with the Supreme Court's interpretation of the Fifth Amendment. "_Miranda_ and its progeny are aimed at dispelling the compulsion inherent in custodial surroundings. Thus, the _Miranda_ safeguards apply only to custodial interrogations" under both constitutions. _State v. Pheil_, 152 Wis. 2d 523, 530-31, 449 N.W.2d 858 (Ct. App. 1989) (citation omitted).[8] "[U]nless a defendant is in custody, he or she may not invoke the right to counsel under _Miranda_." _State v._

---

[8] This exact language has been cited in numerous subsequent decisions. _See, e.g._, _State v. Kramer_, 2006 WI App 133, ¶9, 294 Wis. 2d 780, 720 N.W.2d 459 (quoting _State v. Hassel_, 2005 WI App 80, ¶9, 280 Wis. 2d 637, 696 N.W.2d 270).

15

Kramer, 2006 WI App 133, ¶9, 294 Wis. 2d 780, 720 N.W.2d 459. We therefore turn our attention to what "in custody" means such that an invocation of the right to counsel becomes immediately effective.

¶31 In Miranda, the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. The test to determine whether a person is in custody under Miranda is an objective test. State v. Lonkoski, 2013 WI 30, ¶27, 346 Wis. 2d 523, 828 N.W.2d 552. The inquiry is "whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest." Id. (quoting State v. Leprich, 160 Wis. 2d 472, 477, 465 N.W.2d 844 (Ct. App. 1991)); see also California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Looking at the totality of the circumstances, courts will consider whether "a reasonable person would not feel free to terminate the interview and leave the scene." State v. Martin, 2012 WI 96, ¶33, 343 Wis. 2d 278, 816 N.W.2d 270 (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)).

¶32 We consider a variety of factors to determine whether under the totality of the circumstances a reasonable person would feel at liberty to terminate an interview and leave. Such factors include: the degree of restraint; the purpose, place,

16

and length of the interrogation; and what has been communicated by police officers. State v. Blatterman, 2015 WI 46, ¶¶30, 31, 362 Wis. 2d 138, 864 N.W.2d 26. "When considering the degree of restraint, we consider: whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." State v. Morgan, 2002 WI App 124, ¶12, 254 Wis. 2d 602, 648 N.W.2d 23.

¶33 If we determine that a suspect's freedom of movement is curtailed such that a reasonable person would not feel free to leave, we must then consider whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes v. Fields, 565 U.S. 499, 509 (2012). In other words, we must consider whether the specific circumstances presented a serious danger of coercion, because the "freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Id. (citation omitted). Importantly, a noncustodial situation is not converted to one in which Miranda applies simply because the environment in which the questioning took place was coercive. Mathiason, 429 U.S. at 495. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it . . . . [b]ut police officers are not required to administer Miranda warnings to everyone whom they question." Id. Therefore, "Miranda warnings are not required

17

'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Beheler, 463 U.S. at 1125 (citing Mathiason, 429 U.S. at 495).[9] And finally, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

## C. Bartelt and Custody

¶34 We now turn to whether, under the totality of the circumstances of this case, Bartelt was in custody at any time prior to Clausing taking his cell phone and telling him to remain in the interrogation room. Although the parties agree that the interview was not initially custodial, Bartelt argues that his confession to the attack on M.R. transformed his custody status into one in which a reasonable person would not have felt free to leave. As a result, all further questioning should have ceased once Bartelt invoked his right to counsel.[10]

---

[9] The oft-used example of a situation in which one is physically detained but not in custody is that of a Terry stop or roadside traffic stop. See Terry v. Ohio, 392 U.S. 1 (1968); Berkemer v. McCarty, 468 U.S. 420 (1984). In Berkemer, the Supreme Court analogized traffic stops to Terry stops, concluding that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Berkemer, 468 U.S. at 440.

[10] This argument assumes, although we do not decide, that Bartelt's request for counsel was unequivocal.

18

Accordingly, Bartelt alleges his constitutional rights were violated when detectives from the City of Hartford approached him the following day about the murder of Blodgett without counsel present. Bartelt therefore argues that, under the exclusionary rule, all statements made during the July 17 interview and the evidence that was derived from those statements must be suppressed.

¶35 First, we consider the circumstances surrounding Clausing and Walsh's interrogation of Bartelt. Second, given those circumstances, we consider whether a reasonable person in Bartelt's position would have felt that he or she was at liberty to terminate the interview and leave. "Once the scene is set and the players' lines and actions are reconstructed, [we] must apply an objective test to resolve 'the ultimate inquiry': '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest[?]'" Keohane, 516 U.S. at 112 (quoting Beheler, 463 U.S. at 1125) (quoting Mathiason, 429 U.S. at 495); see also Lonkoski, 346 Wis. 2d 523, ¶27.

¶36 As to Bartelt's custody status, the parties agree that Bartelt was not in custody at the beginning of the interview and up until the point that he confessed to attacking M.R. Bartelt came to the Slinger Police Department voluntarily. He was dropped off by two friends who waited for him in the parking lot, indicating that a reasonable person in Bartelt's position

19

would have believed he or she would be free to leave at the end of the interview.

¶37 Once inside the building, Bartelt was taken through a secured door, locked from the outside only, to the internal portion of the police department. He was then led to an interview room that had two doors, neither of which could be locked, and one of which was left ajar during the interview itself. See Lonkoski, 346 Wis. 2d 523, ¶¶30-32 (holding that where defendant voluntarily came to police department, interview room was locked for entry purposes only, and door was repeatedly opened, defendant was not in custody). The detectives did not search Bartelt, and he was not restrained in any way. All of these circumstances imply he was not in custody. Id., ¶32 (holding that lack of handcuffs and failure to search indicates lack of custody).

¶38 At the outset of the interview, Clausing told Bartelt that he was "not in trouble" and that he was "not under arrest." See Mathiason, 429 U.S. at 495 (considering that defendant came to police department voluntarily and was immediately informed that he was not under arrest were indicative of lack of custody). Bartelt showed that he understood that when he nodded and responded, "that's good." Clausing further advised Bartelt that he could "get up and walk out of here any time [he] want[ed]." See Quigley, 370 Wis. 2d 702, ¶¶40-41 (holding that a police officer's advisements that an interviewee was not under arrest and was free to leave are "of substantial importance,"

20

and further concluding that a suspect's acknowledgement and lack of objection are "highly significant"). Additionally, Clausing testified that neither he nor Detective Walsh ever raised their voice or made a show of authority, such as referencing or removing their weapons.[11] Lonkoski, 346 Wis. 2d 523, ¶32. When Bartelt's phone rang, he was given the opportunity to answer it. See United States v. LeBrun, 363 F.3d 715, 722 (8th Cir. 2004) ("While the mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained."). And finally, the interview lasted only thirty-five minutes. Lonkoski, 346 Wis. 2d 523, ¶31 (holding that a "relatively short" interview of approximately thirty minutes indicated lack of custody). We agree that these factors support the conclusion that, prior to his confession, there was no restraint on Bartelt's freedom to the degree associated with an arrest.

¶39 Nonetheless, Bartelt argues that, as the interview progressed, he was increasingly treated as though he were the target of a serious felony investigation. At the outset of the interview, Clausing told Bartelt that he was investigating an

---

[11] At one point, having caught Bartelt in a lie about his employment and the nature of the cut on his hand, Clausing moved his chair closer to Bartelt, from approximately four or five feet away to within two feet. The ambiance of the interview remained otherwise unchanged.

"incident" that had occurred in Richfield Historical Park on the previous Friday. He did not specify the nature of the incident, nor did he accuse Bartelt of being involved. However, after Bartelt's initial denials and hesitations, the detectives began to insinuate that not only had Bartelt been at the park, but that they suspected——and indeed had evidence——that Bartelt was involved in an attack in the park. The detectives said they knew what happened and just wanted to understand why. Clausing testified that he and Walsh were attempting to minimize Bartelt's moral liability by offering justifications for his behavior. Bartelt argues that the inherently coercive nature of the interview, coupled with the fact that the detectives essentially told Bartelt they believed he was guilty, created an environment such that from the moment Bartelt confessed, no reasonable person would have felt free to leave.

¶40 The court of appeals acknowledged that the detectives "applied some psychological pressures on Bartelt to persuade him to confess . . . ." State v. Bartelt, 2017 WI App 23, ¶35, 375 Wis. 2d 148, 895 N.W.2d 86. We agree that this factor tends to favor custody. However, when combined with all of the other circumstances present here,[12] neither the use of certain interrogation techniques nor that the interview took place at a police station is enough to conclude that Bartelt could not have terminated the interview and left, even after his confession.

---

[12] See supra ¶¶35-36.

22

¶41 In support of this conclusion, the court of appeals cited to an Eighth Circuit decision, United States v. LeBrun, which itself relied heavily on both Mathiason and Beheler. In LeBrun, the suspect in a felony murder voluntarily agreed to accompany police to a nearby patrol office. As they arrived, LeBrun was told that he was not under arrest, that he was free to terminate the interview at any time, and that he was free to leave at any time. LeBrun, 363 F.3d at 718. LeBrun was led to a windowless interview room, where the police used psychological ploys to facilitate a confession. For example, the agents told LeBrun that he was the prime suspect, and that they had significant evidence against him. However, at no point did the officers shout or use physical force, and LeBrun was not restrained in any way.

¶42 After thirty-three minutes of questioning, LeBrun confessed to the crime. Id. In concluding that LeBrun was not in custody before, during, or after his confession, the Eighth Circuit reiterated that "[n]ot every confession obtained absent the Miranda warnings is inadmissible." Id. at 720 (citing Mathiason, 429 U.S. at 495). The critical inquiry, the court concluded, "is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's 'freedom to depart was restricted in any way.'" Id. (citing Mathiason, 429 U.S. at 495).[13] "In answering this

---

[13] In Mathiason, a police officer contacted Mathiason after he had been identified as a potential suspect by a burglary victim. The officer asked Mathiason where it would be
(continued)

23

question, we look at the totality of the circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" Id. (citing Stansbury, 511 U.S. at 322-23). The Eighth Circuit concluded that "the purportedly coercive aspects of [the] interview are largely irrelevant to the custody determination and that the district court erred in giving such great weight to certain facts . . . ." Id. at 720-21.

¶43 This issue was similarly discussed in Beheler, where the defendant, having been told he was not under arrest,

---

convenient to meet, and they agreed to meet at the state patrol office. Once Mathiason arrived, the officer led Mathiason to an office, where he was told that he was not under arrest. During the course of the interview, the officer told Mathiason that he was a suspect and falsely indicated that police had discovered his fingerprints at the scene of the crime. The Supreme Court of Oregon overturned Mathiason's conviction, holding that the interrogation took place in a coercive environment such that Mathiason was in custody. The Supreme Court of the United States reversed:

> [T]here is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

accompanied police to the station for questioning. Beheler was not provided a <u>Miranda</u> warning, and he ultimately confessed during the course of the thirty-minute interview. The Supreme Court concluded that, given the totality of the circumstances, Beheler was neither taken into custody nor significantly deprived of his freedom of action. In so holding, the Court reiterated that a noncustodial situation is not converted to a custodial situation simply because the questioning took place in a coercive environment. <u>Beheler</u>, 463 U.S. at 1124 (citing <u>Mathiason</u>, 429 U.S. at 495).

¶44 As the court in <u>LeBrun</u> aptly noted, "<u>Mathiason</u> and <u>Beheler</u> teach us that some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." <u>LeBrun</u>, 363 F.3d at 721. Furthermore, presenting a suspect with incriminating suggestions does not automatically convert an interview into a custodial interrogation. <u>United States v. Jones</u>, 523 F.3d 1235, 1241 (10th Cir. 2008).

¶45 Given the totality of the circumstances presented herein, we conclude that Bartelt was not in custody at the time of his confession.

¶46 We now turn to Bartelt's argument that from the moment of his confession no reasonable person in his position would have felt free to terminate the interview and leave. In

25

answering this inquiry, the court of appeals focused on whether, given the totality of the circumstances, the environment of the interview after Bartelt's confession "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes, 565 U.S. at 509. The court of appeals concluded:

> [A] defendant making an incriminating statement does not necessarily transform a noncustodial setting to a custodial one. Indeed, "no Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation."

Bartelt, 375 Wis. 2d 148, ¶40 (citing Locke v. Cattell, 476 F.3d 46, 53 (1st Cir. 2007)).

¶47 As an issue of first impression in Wisconsin courts, the court of appeals relied on several out-of-state and federal court decisions, including LeBrun, supra. Ultimately, the court concluded that while a confession is undoubtedly one of the circumstances we must consider, Miranda is specifically "concerned 'with a type of interrogation environment created by the police' and it is this 'atmosphere created by the authorities for questioning' that necessitates Miranda warnings." Bartelt, 375 Wis. 2d 148, ¶46 (citing State v. Clappes, 117 Wis. 2d 277, 283, 344 N.W.2d 141 (1984)). As the court of appeals noted, Miranda itself stated that Miranda warnings are required "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Bartelt, 375 Wis. 2d, ¶47 (citing Miranda, 384 U.S. at 478). Therefore, the

26

court of appeals focused on whether the atmosphere of Bartelt's interview changed after his confession such that a reasonable person would not feel free to leave. Considering the totality of the circumstances, Bartelt's confession was not immediately associated with a restraint on freedom of movement of the degree associated with an arrest.

¶48 First, we note that both before and after Bartelt's confession, Clausing and Walsh spoke in a conversational tone. United States v. Chee, 514 F.3d 1106 (10th Cir. 2008) (concluding, in part, that tone of interview, unchanged even after confession to a serious crime, indicates lack of custody). Although Clausing moved his chair closer to Bartelt after catching Bartelt in a series of lies, the discussion otherwise was not aggressive or confrontational. Thomas v. State, 55 A.3d 680, 696 (Md. 2012) (holding that a confession does not per se render a suspect in custody, especially where the atmosphere of the room never changed); Commonwealth v. Hilton, 823 N.E.2d 383, 396 (Mass. 2005) ("[A]n interview does not automatically become custodial at the instant a defendant starts to confess."). Rather, following Bartelt's admission, the detectives simply continued to ask for details about the attack, which Bartelt continued to supply. United States v. Caiello, 420 F.2d 471, 473 (2d Cir. 1969) (stating that it is the presence or absence of compelling pressures that renders an interview custodial); State v. Lapointe, 678 A.2d 942, 958 (Conn. 1966) ("While we agree that admissions of culpability may lead the police either

27

to arrest a suspect or to place restraints on his freedom approximating an arrest, the police in this case never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial.").

¶49 Second, that Bartelt was arrested at the end of his interview does not necessarily mean that he was in custody at any point prior to his arrest. Thomas, 55 A.3d at 692 (noting that when a suspect is arrested at the end of an interview that does not demonstrate that he was in custody prior to the arrest); Chee, 514 F.3d at 1114 (concluding that until a suspect who has confessed to a crime is arrested, he is merely subject to arrest). Stated otherwise, although Clausing and Walsh clearly suspected Bartelt and had enough evidence to arrest him when he confessed, that in itself did not restrain Bartelt's freedom of movement. Indeed, the defendants in Chee, Beheler, and Mathiason were permitted to go home following their incriminating statements. See Stansbury, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.").

¶50 On review, Bartelt argues that the court of appeals ignored the "many more cases" from other jurisdictions that have gone the other way. Specifically, Bartelt points to several cases indicating that, after confession to a serious crime, a person should generally be considered to be in custody for

<u>Miranda</u> purposes, regardless of whether the confession altered the atmosphere of the interrogation. See <u>State v. Pitts</u>, 936 So. 2d 1111 (Fla. Dist. Ct. App. 2006); <u>Jackson v. State</u>, 528 S.E.2d 232 (Ga. 2000); <u>People v. Ripic</u>, 587 N.Y.S.2d 776 (N.Y. App. Div. 1992); <u>People v. Carroll</u>, 742 N.E.2d 1247 (Ill. Ct. App. 2001); <u>Commonwealth v. Smith</u>, 686 N.E.2d 983 (Mass. 1997); <u>Kolb v. State</u>, 930 P.2d 1238 (Wyo. 1996); <u>Ackerman v. State</u>, 774 N.E.2d 970 (Ind. Ct. App. 2002).

¶51 Bartelt contends that the court of appeals erred in relegating its discussion of these cases to a footnote, in which it asserted that at least two of the cases are not persuasive because they treat a defendant's confession as dispositive. We disagree with Bartelt because the aforementioned cases are readily distinguishable. Furthermore, it is law enforcement's conduct that determines whether a suspect has been taken into custody. As we have explained above, whether a suspect is in custody is a fact-specific inquiry where the totality of the circumstances must be evaluated in full. The totality of the circumstances herein differ from those in the cases Bartelt cites.

¶52 Although the specific question we address today——whether confession to a serious crime transforms a noncustodial interview into a custodial interrogation in these circumstances——is an issue of first impression in Wisconsin, Bartelt contends that our decision in <u>State v. Koput</u>, 142 Wis. 2d 370, 418 N.W.2d 804 (1988), supports the conclusion that no reasonable person

29

would have felt free to leave following his confession to a serious, violent crime. In Koput, we considered whether a defendant, who had arrived for questioning at 9:30 a.m., was in custody by the time he gave an inculpatory statement at 4:15 p.m. Based on the totality of the circumstances, we concluded that Koput was not in custody "until after his confession, sometime after 4:15 PM." Id. at 380.[14] As the court of appeals correctly noted, Koput does not stand for the proposition that it was the confession itself which transformed Koput's custody status. Rather, it was the combination of circumstances *after* the confession that amounted to custody.

¶53 We therefore conclude that although an admission of guilt to a serious crime is a factor to consider in a custody analysis, Bartelt's admission to attacking M.R. was not enough to transform his status to that of "in custody" given the totality of the circumstances. Because Bartelt was not in custody when he asked about counsel, his Fifth Amendment right to counsel did not attach.

---

[14] Koput goes on to state, "It was only then that a reasonable person viewing the situation objectively would conclude that he was not free to leave but was in custody." State v. Koput, 142 Wis. 2d 370, 380, 418 N.W.2d 804 (1988). Bartelt argues that in omitting this language from its opinion, the court of appeals omitted Koput's indication that the defendant's custody status changed after (and because) of his confession. We disagree. Even with this language, Koput does not stand for the proposition that the confession, in and of itself, transformed his custody status.

III. CONCLUSION

¶54 There were two issues on this appeal. First, we considered whether Bartelt was in custody for the purposes of <u>Miranda</u> once he confessed to attacking M.R. We concluded that, in light of the totality of the circumstances, Bartelt's confession did not transform his status to that of "in custody." Rather, Bartelt was not in custody until Detectives Clausing and Walsh took his cell phone, approximately ten minutes after his confession, and instructed him to remain in the interview room. Second, because we determine that Bartelt was not in custody until this point, which was after his alleged request for counsel, we need not and do not reach the issue of whether his alleged request for counsel was unequivocal.

*By the Court.*—The decision of the court of appeals is affirmed.

¶55 ANN WALSH BRADLEY, J. *(dissenting).* "I committed a serious, violent felony." If suspects uttered these words, would law enforcement let them walk out of the station? Would a reasonable person feel free to simply get up and leave? Engaging in a work of fantasy, the majority says yes. Mired to the grips of reality, I say no.

¶56 Legal decisions regarding what the "reasonable person" would do in a given situation do not always reflect the real world. In reality, any reasonable person would not feel free to leave a police interrogation room after confessing to a serious, violent felony. Yet, the majority again finds "a perceived freedom to depart in circumstances when only the most thick-skinned of suspects would think such a choice was open to them." See Wayne R. LaFave, Pinguitudinous Police, Pachydermatous Prey: Whence Fourth Amendment "Seizures"?, 1991 U. Ill. L. Rev. 729, 739-40.[1]

¶57 To further the fantasy, the majority omits relevant facts from its analysis that would lead to the conclusion that Bartelt was in custody after confessing to the attack on M.R. As a result it does not reach a critical issue in this case——whether the defendant clearly and unequivocally invoked his right to counsel. Unlike the majority, I would reach that issue.

---

[1] See also Michelle R. Ghetti, Seizure Through the Looking Glass: Constitutional Analysis in Alice's Wonderland, 22 S.U. L. Rev. 231, 253 (1995); Thomas v. State, 55 A.3d 680, 702-03 (Md. 2012) (Bell, C.J., dissenting).

1

¶58 I conclude that a reasonable person in Bartelt's position would not have felt free to leave the station house interrogation room, and that Bartelt clearly and unequivocally invoked his right to counsel. When considering the totality of the circumstances (namely all of the facts of record), I determine that Bartelt's Fifth Amendment rights were violated. Accordingly, I respectfully dissent.

I

¶59 The majority engages in fantasy by determining that a reasonable person would feel free to leave the police interrogation room under the circumstances presented here. Academic studies, the facts of this case, and common sense support a conclusion contrary to that of the majority.

A

¶60 A suspect is in custody for Miranda purposes if, under the totality of the circumstances, a reasonable person would not feel free to terminate the interview and leave the scene. State v. Lonkoski, 2013 WI 30, ¶6, 346 Wis. 2d 523, 828 N.W.2d 552 (citing State v. Martin, 2012 WI 96, ¶33, 343 Wis. 2d 278, 816 N.W.2d 270).

¶61 Studies demonstrate that the "free to leave" standard that courts apply does not generally reflect what reasonable people actually think and how they act when interacting with law enforcement. Cty. of Grant v. Vogt, 2014 WI 76, ¶71, 356 Wis. 2d 343, 850 N.W.2d 253 (Abrahamson, C.J., dissenting) (citing David K. Kessler, Free To Leave: An Empirical Look at the Fourth Amendment's Seizure Standard, 99 J. Crim. L. &

Criminology 51 (2009); Edwin J. Butterfoss, Bright Line Seizures:  The Need for Clarity in Determining When Fourth Amendment Activity Begins, 79 J. Crim. L. & Criminology 437, 439-42 (1988); Janice Nadler, No Need to Shout:  Bus Sweeps and the Psychology of Coercion, 2002 Sup. Ct. Rev. 153 (2002)).[2]

¶62 Indeed, one study concluded that the average person does not feel free to leave even a simple interaction with law enforcement on a bus or sidewalk.  See Kessler, supra, at 74-75. This result held true even among people who knew they had the right to leave such an encounter.  Id. at 78.

¶63 Our jurisprudence should reflect reality.  It should be based on true inclinations and thought processes rather than pushing the mythical "reasonable person" even further from the bounds of the real world.  The majority in this case accomplishes the latter.

B

¶64 Although the majority correctly invokes analysis of the totality of the circumstances, it errs by ignoring relevant facts that, in the aggregate, support a determination that Bartelt was in custody immediately after confessing to the attack on M.R.

---

[2] Although these studies address the "free to leave" standard with regard to a Fourth Amendment seizure, they are equally applicable to the same standard in relation to the Fifth Amendment.  In both situations, a court must determine whether a reasonable person would feel free to leave.  It defies logic to argue that a person being questioned in a police station under threat of custody would feel more free to leave than a person stopped pursuant to Terry v. Ohio, 392 U.S. 1 (1968).

¶65 First, the majority correctly sets the scene by observing that "Bartelt chose the seat on the far side of the table, while Clausing sat at the end, and Walsh sat opposite Bartelt." Majority op., ¶8. The majority fails to mention, however, that in order to leave the room (unless he went under the table), Bartelt would have had to walk around either detective. Thus, from the outset of the interview, he would have had to squeeze by a detective in his path if he tried to leave the room.

¶66 Second, the majority observes that at one point during the interrogation, Detective Clausing "moved his chair closer to Bartelt, from approximately four or five feet away to within two feet." Id., ¶38 n.11. Yet, according to the majority, "[t]he ambiance of the interview remained otherwise unchanged." Id.[3] I disagree. Under the totality of the circumstances, cutting the distance by half and bringing the detective within arms reach of the suspect changed the atmosphere of the room considerably.

_____

[3] The majority focuses its analysis on law enforcement's conduct, not the suspect's. See majority op., ¶48 (observing that "both before and after Bartelt's confession, Clausing and Walsh spoke in a conversational tone"); see also id. ("Although Clausing moved his chair closer to Bartelt after catching Bartelt in a series of lies, the discussion otherwise was not aggressive or confrontational").

To the extent that this line of analysis evinces a departure from the totality of the circumstances test in favor of a narrow focus on law enforcement conduct, this suggestion can be quickly dispatched. In the next sentence after stating that "it is law enforcement's conduct that determines whether a suspect has been taken into custody," the majority reaffirms that a custody determination is made with reference to the totality of the circumstances. See id., ¶51.

¶67 Detective Clausing's movement in effect shrunk the size of the room and further blocked Bartelt's exit.[4] Subsequently, in order to leave the room, Bartelt would have had not only to walk past either detective, but also if he chose to leave in Detective Clausing's direction, carefully maneuver around Detective Clausing, who now sat a mere two feet away from him.

¶68 Finally, the majority also fails to note an important shift in the tone of the conversation:  Detective Clausing's language becomes coarser.[5]  In fact, Detective Clausing does not utter a curse word over the course of the entire interview until after he pulls his chair closer to Bartelt.  The change in language coupled with the close proximity of the detective to

---

[4] A suspect's purported belief at the beginning of the interview that he would be free to leave at the end of the interview is irrelevant. See majority op., ¶36.  During the course of the interview, circumstances can change.  Indeed they did here.

[5] Detective Clausing lectured Bartelt:

There is [sic] two different types of people that are in your chair at this time. Okay?  There is a person that says, no, f--- this.  F--- you.  Prove it.  And, okay, we will.  But there is a person, you know, I f---ed up, I made a mistake, I screwed up, but here is the reason why.  Okay?  Maybe I have a problem with A, maybe I have a problem with B.  I was out of character.  I'm making bad decisions, and I regret it, and I will do everything in my power to reverse what I did and make things right.

the suspect enhances coercive pressure.[6] In other words, it puts more pressure on the suspect and weighs in favor of a custody determination, even if the officer's comments otherwise remain conversational.

¶69 To summarize: two detectives, one of them two feet away and now swearing at him, block Bartelt's exit path. Yet under the majority's analysis, Bartelt should have felt free to stand up in the interrogation room, squeeze by a hovering detective, and walk out of the police station.

¶70 Add to this atmosphere the fact that the suspect confessed to a serious, violent felony——the assault of M.R. Essentially, the majority determines that a suspect in Bartelt's situation could state to the police, "I committed a serious, violent felony. I'm leaving, see you later," and then march past detectives on the way out of the interrogation room and the police station. This stretches the bounds of credulity.

¶71 Additionally, Detective Clausing testified that he subjectively believed that after Bartelt confessed, Bartelt would not have been free to leave.[7] Is Detective Clausing not a reasonable person?

_____

[6] Although neither the detective's word choice nor his positioning is by itself determinative of custody, each provides further weight in favor of a custody determination when analyzing the totality of the circumstances.

[7] During an evidentiary hearing, Detective Clausing testified as follows:

COUNSEL FOR BARTELT: Okay. And when, from your perspective, did [Bartelt being able to walk out of the room] change during the course of this interview?

(continued)

¶72 I acknowledge that Detective Clausing's subjective view of when Bartelt was in custody is not dispositive. See Lonkoski, 346 Wis. 2d 523, ¶35. However, his view certainly provides a window into the perspective of one reasonable person with a front seat view of the situation. It further demonstrates law enforcement's expected response if Bartelt had simply walked out as the majority contends he could have done.

¶73 If even the interrogating detective testified that a suspect was not free to leave, would a reasonable suspect in such a position really think he could just get up and walk out? Only in a fantasy world would a suspect act in this manner. Common sense tells us that a real world suspect would do no such thing.

¶74 In sum, I determine that the totality of the circumstances clearly indicates that Bartelt was not free to leave. Rather, he was in custody for Miranda purposes immediately after confessing to the attack on M.R.

II

¶75 Finally, because the majority concludes that Bartelt was not in custody until the detectives took his cell phone and

---

DET. CLAUSING: When he admitted to attacking [M.R.].

COUNSEL FOR BARTELT: So at that point in time, he was in trouble, he was going to be under arrest, and he probably wasn't free to get up and leave, true?

DET. CLAUSING: In my mind?

COUNSEL FOR BARTELT: Yes.

DET. CLAUSING: Yes.

7

instructed him to remain in the interview room, approximately ten minutes after his confession, it does not reach the issue of whether Bartelt unequivocally invoked his right to counsel. See majority op., ¶¶3, 54. As explained above, because I determine that Bartelt was in custody for Miranda purposes immediately after confessing to the attack on M.R., I would reach the issue, and determine that Bartelt's invocation of the right to counsel was clear and unequivocal.

¶76 To successfully invoke the right to counsel, a suspect must make a clear and unequivocal request. State v. Edler, 2013 WI 73, ¶34, 350 Wis. 2d 1, 833 N.W.2d 564. "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. (quoting Davis v. United States, 512 U.S. 452, 459 (1994)). Under this objective test, the court must examine the circumstances surrounding the request. Edler, 350 Wis. 2d 1, ¶34.

¶77 The relevant circumstances here are as follows: Bartelt stated, "Should I or can I speak to a lawyer or anything?" Detective Clausing responded, "Sure, yes. That is your option." Bartelt then told him, "I think I'd prefer that." See majority op., ¶16.

¶78 "That" clearly refers to the option to speak to a lawyer. The circumstances surrounding the statement present a question, an answer, and a subsequent follow-up. Given this

8

exchange, a reasonable officer would have understood that Bartelt was accepting the "option" the officer had just presented to him.

¶79 Bartelt's invocation of the right to counsel was informal, but that does not make it ineffective. See Edler, 350 Wis. 2d 1, ¶36; State v. Dumas, 750 A.2d 420, 425 (R.I. 2000) ("A suspect asserting his or her right to counsel need not speak with perfect formality, but may use any manner of colloquial speech, so long as his or her statement would be reasonably understood as a request for an attorney"). The most reasonable interpretation is that Bartelt used the word "think" as colloquial filler, not as an indication of ambiguity.

¶80 Conversely, ambiguous or equivocal statements not invoking the protection, are those from which a reasonable officer "would have understood only that the suspect might be invoking the right to counsel." State v. Jennings, 2002 WI 44, ¶36, 252 Wis. 2d 228, 647 N.W.2d 142 (quoting Davis, 512 U.S. at 459).

¶81 In Jennings, the defendant stated, "I think maybe I need to talk to a lawyer." Jennings, 252 Wis. 2d 228, ¶36. The word "maybe" coupled with "think" in Jennings' statement adds ambiguity not present here. Instead, Bartelt's response was made in reply to the detective's statement that having counsel was his "option." Bartelt clearly chose that option.

¶82 An analogy presented in Bartelt's brief further illustrates that Bartelt's statement was an unambiguous invocation of the right to counsel: "if a customer went to a

9

restaurant and asked the waiter, 'What kind of light beers do you have on tap?,' and the waiter responded, 'Miller Lite and Bud Light.' If the customer then said, "Okay. I think I'd prefer a Miller Lite,' no reasonable person would think this was anything other than a clear request for a Miller Lite." Indeed, this analogy clarifies that neither the word "think" nor the word "prefer" necessarily demonstrates equivocation.

¶83 In sum, Bartelt was in custody for Miranda purposes immediately after confessing to the attack on M.R., and he invoked his right to counsel. Because a reasonable person in Bartelt's position would not have felt free to leave the station house interrogation room, and because Bartelt clearly and unequivocally invoked his right to counsel, I determine that Bartelt's Fifth Amendment rights were violated.

¶84 Accordingly, I respectfully dissent.

¶85 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.